IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TRANSPERFECT GLOBAL, INC. and PHILIP R. SHAWE, | § § § | No. 154, 2021 |
| Respondents Below, Appellants, | § § § | Court Below–Court of Chancery of the State of Delaware |
| v. | § § | C.A. Nos. 9700 & 10449 |
| ROBERT PINCUS, | § § | |
| Movant Below, Appellee. | § § | |

| | | |
|---|---|---|
| TRANSPERFECT GLOBAL, INC. and PHILIP R. SHAWE, | § § § | No. 167, 2021 |
| Respondents Below, Appellants, | § § § | Court Below–Court of Chancery of the State of Delaware |
| v. | § § | C.A. Nos. 9700 & 10449 |
| ROBERT PINCUS, | § § | |
| Movant Below, Appellee. | § § | |

| | | |
|---|---|---|
| TRANSPERFECT GLOBAL, INC. and PHILIP R. SHAWE, | § § § | No. 175, 2021 |
| Respondents Below, Appellants, | § § § | Court Below–Court of Chancery of the State of Delaware |
| v. | § § | C.A. Nos. 9700 & 10449 |
| ROBERT PINCUS, | § § | |
| Movant Below, Appellee. | § § | |

Submitted:   May 4, 2022
Decided:   June 1, 2022

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **AFFIRMED IN PART, REVERSED AND VACATED IN PART.**

Frank E. Noyes, II, Esquire, OFFIT KURMAN, P.A., Wilmington, Delaware; Adam K. Bult, Esquire, BROWNSTEIN HYATT FARBER SCHRECK, LLP, Las Vegas, Nevada, *for Appellant TransPerfect Global, Inc.*

Jeremy Eicher, Esquire, EICHER LAW LLC, Wilmington, Delaware; Alan M. Dershowitz, Esquire, Cambridge, Massachusetts, *for Appellant Philip R. Shawe*.

Jennifer C. Voss, Esquire, Cliff C. Gardner, Esquire, Elisa M.C. Klein, Esquire, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware, *for Appellee Robert Pincus.*

**TRAYNOR**, Justice:

In 2014, Elizabeth Elting, a co-founder of TransPerfect Global, Inc. ("TPG" or "the Company"), asked the Court of Chancery to appoint a custodian to sell the Company because of a hopeless deadlock between Elting and fellow co-founder, Philip R. Shawe. More than eight years later, Elting has sold her shares to Shawe, who won a court-ordered auction supervised by Robert B. Pincus, a custodian duly appointed by the Court of Chancery under 8 *Del. C.* § 226. The parties executed the sale agreement (the "SPA") in November 2017. Although this might have ended the stalemate between Elting and Shawe, it sparked a new series of conflicts that we are asked to resolve here.

With Elting cashed out, the contentious relationship between Shawe and Pincus took center stage. Aside from a brief *détente* when he won the auction, Shawe has been—to be charitable—unsupportive of Pincus's court-mandated role with TPG. The result has been seemingly endless litigation in Delaware, New York, and Nevada, millions in contested legal fees, and an inability to agree on any material aspect of Pincus's tenure as Custodian, up to and including his discharge. All of this occurred while Pincus was finishing a small number of post-closing tasks and attempting to wind-down his custodianship.

This case consolidates three challenges brought by Shawe and TPG to orders of the Court of Chancery. Each of the issues raised on appeal implicates Pincus's

3

right to petition the trial court for reimbursement of fees and expenses under the SPA and various court orders, including its August 13, 2015 Order appointing Pincus as Custodian (the "Appointment Order") and its February 15, 2018 Order approving the sale of Elting's shares to Shawe (the "Final Order"). Broadly speaking, these authorities allow Pincus and his advisers to request reasonable reimbursements related to the custodianship, but the parties disagree bitterly about the operation and reach of each provision.

Shawe and TPG first challenge the Court of Chancery's October 17, 2019 order (the "Contempt Order"), which found them both in contempt of an exclusive jurisdiction provision contained in the Final Order. According to the court, the contemptuous act was a lawsuit TPG filed in August 2019 against Pincus in Nevada state court (the "Nevada Action"). We agree that this constituted a violation of the Final Order and that the Court of Chancery was justified in finding TPG in contempt. But we reverse the portion of the Contempt Order finding Shawe in contempt because he was not a plaintiff in the Nevada Action and the trial court did not specifically determine that he bore personal responsibility for TPG's conduct. Shawe owns 99 percent of TPG, but this does not, without more, make him personally liable for the Company's violation.

Second, Shawe and TPG appeal the Court of Chancery's April 14, 2021 order (the "Discharge Order"), which terminated Pincus's custodianship. Shawe and TPG

argue that the Discharge Order improperly expanded Pincus's protection from lawsuits, violating the SPA. We do not accept that the Discharge Order conflicts with the SPA; in any case, a contract cannot prospectively constrain the Court of Chancery's discretionary authority under 8 *Del. C.* § 226 to manage a custodianship. Thus, we affirm the Discharge Order.

Third, Shawe and TPG object to the Court of Chancery's April 30, 2021 Order (the "2021 Fee Order") awarding Pincus $3,242,251 in fees and expenses incurred from May 2019 to December 2020. Subject to the qualification that Shawe is not personally liable for any of these fees given our reversal of the Contempt Order as applied to him, we affirm the 2021 Fee Order as free from legal error and a product of the sound exercise of the trial court's discretion.

# I. FACTUAL BACKGROUND

## A. The Court of Chancery Appoints Pincus as Custodian to Sell TPG

Elting and Shawe launched TPG from their dorm room in 1992.[1] The Company provides translation, litigation support, and website localization services. It was previously incorporated in Delaware and is now organized in Nevada.[2] As TPG grew, Elting and Shawe planned to wed, but after Elting called the marriage off, the co-founders gradually lost any ability to work together.[3] Serving as co-CEOs, they would "harass each other, interfere with the business, and demoralize the employees."[4] Shawe was often the instigator. On one occasion, he was caught surveilling Elting's communications.[5] On another, he followed her to Paris by

---

[1] *In re Shawe & Elting LLC*, 2015 WL 4874733, at *1, (Del. Ch. Aug. 13, 2015), *aff'd sub nom. Shawe v. Elting*, 157 A.3d 152 (Del. 2017) (*Shawe I*) (affirming the appointment of Pincus as Custodian). The instant appeal is the fifth time this Court has addressed the custodianship of TPG, *see In re Shawe & Elting LLC*, 2016 WL 3951339 (Del. Ch. July 20, 2016), *aff'd sub nom. Shawe v. Elting*, 157 A.3d 142 (Del. 2017) (*Shawe II*) (ordering Shawe to pay $7.1 million in Elting's legal fees due to his litigation misconduct); *In re TransPerfect Glob., Inc.*, 2018 WL 904160 (Del. Ch. Feb. 15, 2018), *aff'd sub nom. Elting v. Shawe*, 185 A.3d 694, 2018 WL 2069065 (Del. May 3, 2018) (TABLE) (*Shawe III*) (approving the sale of Elting's shares to Shawe); *In re TransPerfect Glob., Inc.*, 2019 WL 5260362 (Del. Ch. Oct. 17, 2019), *appeal dismissed sub nom. TransPerfect Glob., Inc. v. Pincus*, 224 A.3d 203, 2019 WL 7369433 (Del. 2019) (TABLE) (*Shawe IV*). This consolidated appeal might be designated *Shawe V*, though this does not include various decisions by the Court of Chancery that we have not directly reviewed, nor does it count litigation by Shawe and TPG against Pincus, Elting, and related parties in other forums. *See, e.g.*, *Shawe v. Bouchard*, 2021 WL 1380598 (D. Del. Apr. 12, 2021); *Shawe v. Elting*, 126 N.E. 3d 1060 (N.Y. 2019); *Shawe v. Pincus*, 265 F. Supp. 3d 480 (D. Del. 2017); *Shawe v. Potter Anderson & Corroon LLP*, 2017 WL 6397342 (D. Del. Dec. 8, 2017).

[2] *In re TransPerfect Glob., Inc.*, 2019 WL 5260362, at *8 n.56 (Del. Ch. Oct. 17, 2019) [hereinafter Contempt Op., 2019 WL 5260362, at *__].

[3] *Shawe I*, 157 A.3d at 157.

[4] *Id.*

[5] *Id.* at 156.

6

6

"arrang[ing] to be seated next to her without her knowledge" on a commercial flight from New York.[6]

In 2014, Elting threw up her hands and sought relief from the Court of Chancery. At that point, TPG was controlled evenly—or not at all—by Elting and Shawe, who each held one director seat.[7] Elting owned 50 shares of TPG, Shawe owned 49, and his mother, Shirley Shawe, owned one, which she allowed her son to control.[8] At an impasse, on May 23, 2014, Elting filed a petition under 8 *Del. C.* § 226, asking the Court of Chancery to appoint a custodian to sell TPG because the governance of the company was deadlocked.[9] After twelve hearings, sixteen motions, and a six-day trial, the court asked Pincus to mediate Elting's and Shawe's disputes.[10] When mediation failed, the court issued the Appointment Order, naming Pincus the Custodian of TPG to oversee a sale of the Company.[11] The court also named Pincus as the third director of TPG and instructed him to break ties on critical board-level business decisions.[12] Shawe appealed Pincus's appointment, and we affirmed in *Shawe I*.[13]

---

[6] *Id.* at 157.
[7] *Id.* at 156.
[8] *Id.* at 155–156. Shirley Shawe's one-percent interest allowed TPG "to claim the benefits of being a majority women-owned business." *Id.*
[9] *Id.* at 158.
[10] *Id.*; *see* Mar. 9, 2015 Order Appointing Pincus as Mediator, App. to Opening Br. at A743 [hereinafter A____].
[11] Appointment Order, A749.
[12] *Shawe I*, 2015 WL 4874733, at *32. Director Indemnification Agreement at 1, A753.
[13] *Shawe I*, 157 A.3d at 157.

## B. Shawe Purchases Elting's 50-percent Interest in TPG

To sell the Company, Pincus designed a modified-auction process that allowed both Shawe and Elting to bid for full control, which the court approved in a July 18, 2016 Order (the "Sale Order").[14]  Elting never submitted a competitive offer.[15]  Instead, Shawe bid against H.I.G. Middle Market, LLC ("H.I.G."), which owned TPG's top competitor.[16]  In the final round, H.I.G. slightly outbid Shawe, but Pincus determined that Shawe would ultimately deliver "with fewer closing conditions and other better terms while retaining virtually all of the Company's employees."[17]

On November 9, 2017, Shawe agreed in the SPA to purchase Elting's 50-percent ownership in TPG for $385 million in cash, implying an enterprise value of $770 million.[18]  Shawe completed the purchase through PRS Capital, a New York LLC that he controlled as the sole and managing member.[19]  PRS Capital is now known as TransPerfect Holdings, LLC.[20]  Through TransPerfect Holdings, Shawe

---

[14] Sale Order ¶ 1, A766.
[15] *Shawe III*, 2018 WL 904160, at *11.  Elting joined a group led by Blackstone, whose "bid simply was not competitive."  *Id*. (internal quotation marks omitted).
[16] *Id.* at *1.
[17] *Id.* at *12.
[18] *Id.*
[19] SPA at 1, A777.
[20] *TransPerfect Global, Inc. v. Robert B. Pincus, Esq.*, No. A-19-800185 (Clark Cnty., Nev.), Compl. ¶ 6, A1120 [hereinafter Nev. Compl. ¶ __].

owns 99 percent of TPG, and his mother owns one percent.[21]   Shawe is now the

Company's sole CEO.[22]

The Court of Chancery entered the Final Order approving the SPA on

February 15, 2018.[23]   The Final Order applies to the Court of Chancery civil actions

that have addressed Elting's petition and Pincus's custodianship, C.A. Nos. 9700 (*In*

*re TransPerfect Global*) and 10449 (*Elting v. Shawe and TransPerfect Global*).[24]

The Final Order contains three provisions relevant to the consolidated appeals.

Paragraph 7 entitles Pincus and his law firm, Skadden, Arps, Slate, Meagher & Flom

("Skadden") "to judicial immunity and to be indemnified by the Company . . . to the

fullest extent permitted by Law."  It also provides that

> fees and expenses incurred by the Custodian or Skadden,
> Arps, Slate, Meagher & Flom LLP (and its partners and
> employees) in defending or prosecuting any civil,
> criminal, administrative or investigative claim, action, suit
> or proceeding reasonably related to the Custodian's
> responsibilities under the Sale Order or this Order, shall be
> paid by the Company[.][25]

---

[21] Shawe was the sole and managing member of PRS Capital LLC when it purchased Elting's shares.  *Shawe III*, 2018 WL 904160, at *12.  TPG's recent filings in other courts indicate that Shawe owns 99 percent of TransPerfect Holdings and Shirley Shawe owns 1 percent.  *See* Nev. Compl. ¶ 6–7, A1120–21.   In turn, TransPerfect Holdings owns 100 percent of TPG, according to these filings.  *Id.*

[22] *Id.* ¶ 7, A1121.

[23] Final Order ¶ 2, A925.

[24] *Id.* at 1, A919.

[25] *Id.* ¶ 7, A933–34.

Additionally, Paragraph 8 confirms the continued validity of the court's previous orders.[26] And Paragraph 10 provides that "the Court retains continuing and exclusive jurisdiction over the parties to the Actions for all matters relating to the Actions, including the administration, interpretation, effectuation or enforcement of the Sale Agreement . . . and all orders of the Court[.]"[27]

We affirmed the Final Order on May 3, 2018.[28] Pincus resigned from the TPG board on May 7 but remained as Custodian to complete certain post-closing tasks.[29]

**C. Pincus Seeks Fees Directly from TPG**

Beginning with his appointment in August 2015, Pincus regularly petitioned the Court of Chancery to approve reimbursement of his fees and expenses. He did so by invoking Paragraphs 10 and 11 of the Appointment Order.[30] Paragraph 10 provides that "[t]he Custodian shall be compensated at the usual hourly rate he charges as a partner of Skadden" and "reimbursed for reasonable travel and other expenses incurred in the performance of his duties."[31] Paragraph 11 allows Pincus to retain advisors, whose fees "shall be calculated on the same hourly rates charged

---

[26] *Id.* ¶ 8, A935.
[27] *Id.* ¶ 10, A936.
[28] *Shawe III*, 185 A.3d 694.
[29] May 7, 2018 Letter Agreement, A943; Contempt Op., 2019 WL 5260362, at *6; Letter from Custodian to the Hon. Andre G. Bouchard at 2 (May 10, 2018), App. to Answering Br. at B502.
[30] Contempt Op., 2019 WL 5260362, at *6 n.36.
[31] Appointment Order ¶ 10, A751; *see* Custodian's Sept. 2015 Status Rep. at 5, Ch. Dkt. No. 640.

by such counsel or advisors to clients represented outside this matter."[32]  After the sale, Pincus initially exercised his discretion to bill his fees directly to an escrow fund (the "Escrow") that was created by the SPA and funded evenly by Shawe and Elting as a "non-exclusive source of funds" for Pincus's expenses.[33]  The court restated Pincus's right to recover fees in its Sale and Final Orders.[34]

For about a year after the sale closed, relative calm prevailed.  Pincus sought fees from the Escrow, and neither Shawe nor TPG objected.[35]  This all changed for the worse in May 2019.  In his monthly status report, Pincus advised the court that he intended to begin seeking fees directly from TPG, rather than the Escrow, for bills related to two lawsuits involving TPG but not Elting.[36]  In the first lawsuit, Cypress Partners sued Shawe in New York for his purported failure to pay bills related to advisory services Cypress provided Shawe during his bid for TPG (the "Cypress Action").[37]  In the second case, TPG sued H.I.G., which had finished second to

---

[32] Appointment Order ¶ 11, A751.
[33] *Id.*; SPA § 2.2, A789.
[34] *See* Sale Order ¶ 14, A770 ("The Custodian shall be compensated at the usual hourly rate he charges [and] reimbursed for reasonable travel and other expenses incurred in the performance of his duties. . . . Any fees and expenses approved by the Court shall be paid promptly by the Company."); Final Order ¶ 7, A934 ("[F]ees and expenses incurred by the Custodian or Skadden . . . in defending or prosecuting any civil, criminal, administrative or investigative claim, action, suit or proceeding reasonably related to the Custodian's responsibilities under the Sale Order or this Order, shall be paid by the Company[.]").
[35] *See, e.g.*, May 2018 Order Approving Fees and Expenses at 1, A969.
[36] Custodian's May 2019 Status Rep. at 10, A1003.
[37] *Cypress Partners LLC v. Shawe and John Does Nos. 1-10*, Compl. ¶ 1, A1008.

Shawe in the auction, alleging that it had stolen TPG's trade secrets during the sale process (the "H.I.G. Action").[38]

Pincus cited Paragraph 7 of the Final Order and Paragraph 14 of the Sale Order as authorities that permitted him to request fees directly from TPG for time spent "defending or prosecuting" legal actions.[39] True to his word, in June and July 2019 he sought $65,203.85 in fees directly from TPG for his work responding to the Cypress and H.I.G. Actions.[40] TPG did not object to these requests, and the court issued orders approving them (the "2019 Fee Orders").[41]

### D. TPG Sues Pincus in Nevada

After failing to object in the Court of Chancery, TPG challenged the 2019 Fee Orders by suing Pincus in Nevada state court on August 13, 2019 (the aforementioned "Nevada Action").[42] Shawe was not a named plaintiff.[43] Invoking the Appointment Order and the Final Order, TPG's complaint alleged that it was not required to indemnify Pincus for his time spent as a witness in the Cypress and H.I.G.

---

[38] *TransPerfect Glob.l, Inc. v. Lionbridge Techns., Inc.*, and *H.I.G. Middle Market, LLC*, 19-cv-03283, Compl. ¶ 1, A1019.

[39] Custodian's May 2019 Status Rep. at 10–11 n.7, A1003–04; *see* Contempt Op., 2019 WL 5260362, at *7.

[40] Custodian's June 2019 Status Rep. at 2, A1107 ("According to the records, as of May 31, 2019, I incurred $58,767.71 in unbilled fees and expenses, primarily related to the two new lawsuits referred to in the May 8th report."); Custodian's July 2019 Status Rep. at 2, A1115 (requesting $6,436.14 from TPG and $83,753 in accounting fees from the Escrow).

[41] Jun. 28, 2019 Order Approving Fees and Expenses, A1109; July 17, 2019 Order Approving Fees and Expenses, A1117.

[42] Nev. Compl. ¶ 1, A1119. The Nevada Action was captioned "*TransPerfect Global, Inc. v. Robert B. Pincus*, No. A-19-800185-B."

[43] *Id.* at 1, A1119.

Actions.[44] The complaint asked the Nevada court to determine "whether TPG has a duty to indemnify Pincus for the time expended in preparation as a third-party witness" and alleged that Pincus had breached his fiduciary duties as a director of TPG.[45] It also attached copies of the Appointment Order,[46] the Sale Order,[47] and the 2019 Fee Orders.[48] A week after TPG filed the Nevada Action, Pincus submitted a new fee petition to the Court of Chancery, and Shawe formally opposed it.[49]

### E. The Court of Chancery Finds TPG and Shawe in Contempt for Violating the Final Order, But Not for Violating the 2019 Fee Orders

Pincus moved the Court of Chancery to find Shawe and TPG in contempt on August 26, 2019.[50] Pincus's motion asserted that Shawe and TPG violated Paragraph 10 of the Final Order when TPG filed the Nevada Action outside the Court of Chancery and violated the 2019 Fee Orders by refusing to pay the awarded fees.[51] The motion requested a *per diem* sanction against TPG and Shawe for each day the

---

[44] *Id.* ¶ 14–16, A1122. "The Delaware Chancery Court further stated in the [Appointment Order] that TPG was under [an] obligation to indemnify to the fullest extent permitted by law Pincus and Skadden for "fees and expenses incurred by the Custodian and Skadden in <u>defending</u> any civil, criminal, administrative or investigative claim, action, suit or proceeding reasonably related to the Custodian's responsibilities under the [Appointment Order] . . ." (emphasis added by TPG in the Nevada Complaint). The Nevada Complaint identifies the respective orders by their dates of issue. *Id.*

[45] *Id.* ¶¶ 46, 52, A1127–28.

[46] *Id.* Ex. 2, A1173.

[47] *Id.* Ex. 3, A1176.

[48] *Id.* Ex. 6, A1213; *id.* Ex. 7, A1217; *id.* Ex. 9, A1221.

[49] Contempt Op., 2019 WL 5260362, at *8.

[50] Custodian's Mot. for an Order to Show Cause Why TransPerfect Global, Inc. and Philip R. Shawe Should Not Be Held in Contempt, A1319 [hereinafter Custodian's Mot. for Contempt].

[51] *Id.* ¶ 8, A1323; *id.* ¶ 18, A1327.

Nevada Action remained pending, a sanctions award covering Pincus's fees for litigating the Nevada Action and the contempt motion, and an injunction barring further suits outside the court's jurisdiction.[52]

In response, TPG amended its Nevada Complaint to include a claim under the Director Indemnification Agreement (the "DIA"), which the parties had executed when Pincus became custodian.[53] The additional claim asserted that the DIA allowed TPG to sue Pincus in any court of competent jurisdiction.[54]

### i. The Court Finds Shawe and TPG in Contempt of the Final Order

On October 17, 2019, the Court of Chancery issued an opinion and order (the "Contempt Opinion" and "Contempt Order," respectively) finding Shawe and TPG in contempt for violating the Final Order.[55] After determining that the parties were bound by the Final Order and had notice of it, the court held that "the Custodian . . . has established by clear and convincing evidence that Shawe and TransPerfect violated paragraph 10 of the Final Order in a meaningful way."[56] The court explained that "the Nevada action specifically puts at issue[,] and thus deprives this

---

[52] *Id.* ¶ 21, A1328–29.
[53] *See* DIA § 14N, A761–62.
[54] Amd. Nev. Compl. ¶¶ 51, 65, A1527–30. Additionally, on October 7, 2019, TPG moved for summary judgment in the Nevada action, triggering a 10-day deadline for the Custodian to respond. Contempt Op., 2019 WL 5260362, at *9. The Nevada court stayed the action the next day. *Id.* n.72.
[55] Contempt Op., 2019 WL 5260362, at *10; Contempt Order ¶ 1, Ex. A to Opening Br.
[56] Contempt Op., 2019 WL 5260362, at *13.

court of exclusive jurisdiction over parties to these actions with respect to" the SPA and the Sale and Final Orders.[57] Throughout its analysis, the court discussed TPG and Shawe collectively and did not find that Shawe directed TPG to file the Nevada Action.

Along with its contempt findings, the court imposed a fine of $30,000 for each day the Nevada Action was not dismissed and, as a sanction, ordered Shawe and TPG to pay the fees incurred by Pincus in litigating the Nevada Action and contempt motion (the "Contempt Sanction").[58] The court also issued an anti-suit injunction against Shawe and TPG covering the Nevada Action.[59] TPG dismissed the Nevada Action the day before the fine was to take effect.[60]

### ii. The Court Determines that Shawe and TPG Violated the Fee 2019 Orders but Does Not Find Them in Contempt

Although the court determined that Shawe and TPG had violated the 2019 Fee Orders by failing to pay Pincus's bills for June and July 2019—a contested amount of $65,203.85—it declined to make an additional contempt finding.[61] The court explained that "some practical concerns" related to the fee-request process informed

---

[57] *Id.* at *11.
[58] Contempt Order ¶ 2–4, Ex. A to Opening Br.
[59] *Id.*
[60] Not. of Voluntary Dismissal at 2, A2568.
[61] Telephonic Rulings on Mot. for Contempt of Fee Orders at 4–5, A2503–04.

15

its decision.[62]  In response to these concerns, the court made slight modifications to the fee-petition process in a November 2019 Order (the "Fee Process Order").[63]

The Fee Process Order required Pincus to provide additional billing documentation and also established an objection procedure, subject to language in Paragraph 3(e) allowing the court to shift fees in the event that a party "acted in bad faith regarding the fee petition and objection process."[64]  Paragraph 3(e) clarified that any fee-shifting "shall be in addition to, and without prejudice to, the Custodian's right to recover such amounts pursuant to the Court's orders or any other agreement or entitlement."[65]  The Fee Process Order provided that, except for the additions described above, "this Order does not modify, invalidate or otherwise alter any provision of the Sale Order [or] the Final Order[.]"[66]

Shawe and TPG appealed the Contempt Order and the Fee Process Order to this Court.  We declined to hear these interlocutory appeals because they implicated several open issues, including a monetary award—the Contempt Sanction—that had

---

[62] *Id.* at 6–8, A2505–07.

[63] Fee Process Order, Ex. B to Opening Br.

[64] *Id.* ¶ 3(e), Ex. B to Opening Br.  "To the extent that any party is found to have acted in bad faith regarding the fee petition and objection process set forth in Paragraph 3(c) herein, the Court may order that such party pay fees and expenses incurred by the other party or parties in connection with the objection process at issue.  For the avoidance of doubt, any such order shall be in addition to, and without prejudice to, the Custodian's right to recover such amounts pursuant to the Court's orders or any other agreement or entitlement.  Nothing in this Paragraph shall be construed to allow the Custodian a double recovery of fees and expenses, unless the Court otherwise orders."  *Id.*

[65] *Id.*

[66] *Id.* ¶ 2.

not yet been calculated.[67]  Shortly after we declined to accept the appeals, the parties—at the Court of Chancery's request—agreed to mediate their remaining disputes before former Chancellor Chandler.[68]  Mediation stalled by November 2020.[69]

### F. The Court of Chancery Discharges Pincus as Custodian and Awards Him $3.2 Million in Fees and Expenses

After mediation failed, the court asked Pincus to petition "for attorneys' fees and expenses that were not included in any prior fee petition" and to move for discharge.[70]  The court also directed Pincus to answer motions from TPG and Shawe that demanded that Pincus be held in contempt for failing to timely file fee petitions and challenged previous fee petitions.[71]  Pincus answered the motions and provided a proposed order of discharge on December 15, 2020.[72]  He then filed petitions that collectively sought $3,868,363 in fees and expenses for the period spanning May 2019 to December 2020.[73]

---

[67] *Shawe IV*, 2019 WL 7369433, at *3.

[68] *In re TransPerfect Global, Inc.*, 2021 WL 1711797, at * 16 (Del. Ch. Apr. 30, 2021) [hereinafter Fee Op., 2021 WL 1711797, at *__].

[69] *Id.* at *17.

[70] Letter from the Hon. Andre G. Bouchard at 2, A3702.

[71] *Id.*; *see* Joint Mot. for an Order to Show Cause Why Pincus and Skadden Should Not Be Held in Contempt and Precluded from Submitting Untimely Fee Petitions at 1–2, A3552–53.

[72] Custodian's Opp. to Mot. for Contempt, A3706; Custodian's Opp. to Mot. to Preclude Custodian from Recovering Fees and Expenses, A3722; Custodian's Mot. for Order of Discharge, A3738.

[73] *See* Ex. A to Fee Op. at 1, Ex. D to Opening Br.

### i.    The Court Discharges Pincus

Pincus proposed a 17-paragraph order of discharge.  His proposal provided that he would retain "all of, and not less than all of, the protections" granted to him by Delaware law and the orders and agreements related to the custodianship.[74]  The proposal also sought to provide illustrative examples of these protections "[f]or the avoidance of doubt[.]"[75]  One of Pincus's requests was that the order of discharge clarify that TPG was required to release all potential claims of liability against him.[76]  TPG and Shawe argued that this proposal "would revise and override the provisions of the SPA" as well as prior orders of the Court of Chancery.[77]  In its place, they suggested a one-paragraph order terminating the custodianship and providing that "going forward the Custodian . . . shall retain the same protections and indemnification rights granted to him under the [SPA], the Sale Order and the Final Order[.]"[78]

The Court of Chancery rejected much of Pincus's proposal but agreed that "a nuanced discharge order"—rather than the single paragraph proposed by Shawe and TPG—was "necessary to provide clarity on the terms of discharge."[79]  Specifically,

---

[74] Custodian's Proposed Order of Discharge ¶ 3, A3753.

[75] *Id.* ¶¶ 6–15, A3755–3764.

[76] *Id.* ¶ 15, A3762–63; *see* Custodian's Mot. for Discharge at 3, A3740.

[77] Joint Opp'n to Mot. for Order of Discharge ¶¶ 1, 4, A3880–3881.

[78] Shawe's and TPG's Proposed Order of Discharge, A3901.

[79] Discharge Op., 2021 WL 1401518, at *1.

the court repeated the primary protections of the SPA, Sale Order, and Final Order.[80] It also included language requiring TPG to waive all claims against Pincus in his capacity as Custodian.[81]

### ii. The Court Awards Pincus $3.2 Million in Fees and Expenses

In an order issued on April 30, 2021, and accompanied by a 135-page opinion (the "2021 Fee Order" and "Fee Opinion," respectively), the Court of Chancery awarded Pincus $3,242,251 in fees and expenses for the period spanning May 2019 to December 2020.[82] This was approximately 84 percent of the $3,868,363 that Pincus initially requested.[83] The 2021 Fee Order separated the award into three parts: $1,907,039 to be paid by TPG, $186,291 to be paid by the Escrow funded evenly by Shawe and Elting, and $1,148,291 to be paid by Shawe and TPG in fulfillment of the Contempt Sanction issued by the court after TPG filed the Nevada Action.[84]

---

[80] Discharge Order ¶ 3, Ex. C to Opening Br. at 11.

[81] *Id.* ¶ 9, Ex. C to Opening Br. at 14–15.

[82] 2021 Fee Order at 1–2, Ex. D to Opening Br.; Fee Op., 2021 WL 1711797, at *52.

[83] Fee Op., 2021 WL 1711797, at *18. After oral argument on this fee motion, Pincus voluntarily withdrew $204,485 in "fees on fees" at the trial court's suggestion. *Id.*; Mar. 2, 2021 Oral Arg. Tr. at 138–140 (THE COURT: "I'm going to give you a reaction on one issue concerning fees that gives me some pause, which is the notion of fees on fees. . . . I am not aware that it would be ordinary to bill a client for the administrative work of sending a bill, which is akin to filing a petition, if you will. . . . If you want to carve that out, it might be prudent to do so.").

[84] 2021 Fee Order ¶ 4, Ex. D to Opening Br. The 2021 Fee Order also denied Shawe's and TPG's motion to find Pincus in contempt for delayed fee petitions, a decision Shawe and TPG do not directly appeal. *Id.* ¶ 1, Ex. D to Opening Br.

In evaluating Pincus's request, the court conducted an exhaustive analysis of his submissions and the related objections from Shawe and TPG. In at least six areas, it rejected or reduced Pincus's fees.[85] After working through the manifold objections lodged by Shawe and TPG, the court concluded that the $3.2 million award was reasonable under Rule 1.5(a) of the Delaware Lawyers' Rules of Professional Conduct.[86] The court required Shawe and TPG to pay Pincus by May 7, 2021.[87] This deadline came and went, but TPG completed the payment in September 2021 in the face of another contempt motion from Pincus.[88]

## II. ANALYSIS

Shawe and TPG bring three claims on appeal.[89] First, they challenge the October 17, 2019 order (again, the "Contempt Order") and maintain that the trial court erred by finding each of them in contempt of the Final Order for TPG's filing of the Nevada Action. We affirm the Contempt Order as it applies to TPG but hold

---

[85] *See* Fee Op., 2021 WL 1711797, at *32 (reducing fees for clerical and administrative work); *id.* at *41 (excluding fees for defending confidentiality motions); *id.* at *43 (excluding fees for the preparation of billing statements); *id.* at *44 (excluding fees for the preparation of monthly update letters); *id.* at *46 (partially excluding fees for preparation of a proposed discharge order); *id.* at *47–48 (excluding fees for preparation of a settlement offer and reducing fees for a large Westlaw charge).

[86] *Id.* at *48.

[87] 2021 Fee Order ¶ 4, Ex. D to Opening Br.

[88] *See* Ex. A to Appellants' Mot. to Supp. the R. at 2–4. The final piece of the payment cleared in October 2021 when it was released from the Escrow. *Id.* Having reviewed this motion to supplement the record filed by Shawe and TPG, and noting that it is unopposed, the Court hereby GRANTS the motion.

[89] Shawe and TPG initially filed three separate appeals. We consolidated the cases on June 29, 2021. Order Consolidating Appeals, *TransPerfect Glob., Inc. v. Pincus*, Nos. 154, 167, and 175, 2021 (Del. June 25, 2021).

that the court erred when it sanctioned Shawe. Second, Shawe and TPG assert that the April 14, 2021 order (the "Discharge Order") improperly expanded Pincus's protections. We affirm the Discharge Order as a sound exercise of the trial court's discretion. Finally, Shawe and TPG appeal the April 30, 2021 order (the "2021 Fee Order") and contend that the Court of Chancery abused its discretion by awarding an unreasonable amount of fees. We disagree and affirm the 2021 Fee Order, subject to a qualification discussed below. Our reasoning follows.

## A. The Court of Chancery Appropriately Found TPG in Contempt for Filing the Nevada Action but Erred in Sanctioning Shawe

The Court of Chancery found Shawe and TPG in contempt for TPG's filing of the Nevada Action, which the court determined violated the exclusive jurisdiction provision—Paragraph 10—of the Final Order.[90] This finding had two monetary consequences: first, TPG had to—and did—dismiss the Nevada Action by a certain date to avoid a daily fine of $30,000; and second, the court charged Shawe and TPG with a Contempt Sanction of $1,148,291 in fees payable to Pincus.[91] TPG paid the Contempt Sanction in September 2021, but along with Shawe still contests its validity.[92]

---

[90] Contempt Op., 2019 WL 5260362, at *10.
[91] 2021 Fee Order ¶ 4, Ex. D to Opening Br.
[92] *See* Ex. A to Mot. to Supp. the R. at 1.

Civil contempt is a weighty sanction that can be accompanied by a range of punishments, including fines and imprisonment.[93] Court of Chancery Rule 70(b) authorizes the court to make a contempt finding "[f]or failure . . . to obey or to perform any order[.]"[94] In *Gallagher v. Long*, we held that "[a] trial judge has broad discretion to impose sanctions for failure to abide by [court] orders" subject to the requirement that the "decision to impose sanctions must be just and reasonable."[95] When an asserted violation of a court order is the basis for contempt, the party to be sanctioned must be bound by the order, have clear notice of it, and nevertheless violate it in a meaningful way.[96] The burden of proof rests with the movant—here, Pincus—who must "establish[] [the] contemptuous conduct by a preponderance of the evidence[.]"[97] If the movant makes out a *prima facie* case, "the burden then

[93] *State ex rel. Buckson v. Mancari*, 223 A.2d 81, 82 (Del. 1966); *see also* Am. Jur. 2d *Contempt* § 191 ("Incarceration for contempt may be either civil or criminal; the distinguishing factor is whether the incarceration is for a definite period of time, which is the hallmark of criminal contempt, or whether the contemnor may avoid or cut short the incarceration by complying with the court's directive, which indicates civil contempt.").

[94] Ch. Ct. R. 70(b).

[95] *Gallagher v. Long*, 940 A.2d 945, 2007 WL 3262150, at *2 (Del. 2007) (TABLE) (citing *Lehman Cap. v. Lofland*, 906 A.2d 122, 131 (Del. 2006)).

[96] *Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 WL 6338996, at *1 (Del. Ch. Dec. 4, 2018); *Gallagher*, 2007 WL 3262150, at *2; *Mother Afr. Union First Colored Methodist Protestant Church v. Conf. of Afr. Union First Colored Methodist Protestant Church*, 1992 WL 83518, at *9 (Del. Ch. Apr. 22, 1992), *aff'd*, 633 A.2d 369, 1993 WL 433524 (Del. 1993) (TABLE) (requiring "clear" and "definite" notice); *Dickerson v. Castle*, 1991 WL 208467, at *4 (Del. Ch. Oct. 15, 1991) (requiring that a violation be "meaningful" rather than "a mere technical one[.]").

[97] *Wilmington Federation of Teachers v. Howell*, 374 A.2d 832, 838 (Del. 1977); *see also Hurley*, 257 A.3d at 1018 & n.32 (explaining the distinction between civil contempt and criminal contempt, the latter of which requires a showing of clear and convincing evidence.). Writing before our decision in *Hurley*, the Court of Chancery found Shawe and TPG in civil contempt of the Final Order by clear and convincing evidence. Contempt Op., 2019 WL 5260362, at *10. Although we

shifts to the contemnors to show why they were unable to comply with the order."[98]

After that, the court must make findings of fact and determine whether each party carried its burden.[99] Critically, these fact findings must be specific to each defendant.[100]

We review contempt findings for abuse of discretion and respect the court's factual determinations unless they are clearly erroneous.[101] Our review of claimed errors of law—including the application of the legal standard for contempt—is *de novo*.[102] Shawe and TPG argue that contempt was improper because the court's orders "did not provide the clear, definite, and specific notice required to issue

---

restate that the preponderance standard is the appropriate burden for findings of civil contempt, the evidentiary burden does not otherwise affect our analysis in this case.

[98] *TR Invs., LLC v. Genger*, 2009 WL 4696062, at *15 (Del. Ch. Dec. 9, 2009), *aff'd*, 26 A.3d 180 (Del. 2011); *accord Gorman v. Salamone*, 2015 WL 4719681, at *9 (Del. Ch. July 31, 2015).

[99] *TR Invs.*, 2009 WL 4696062, at *15–16 ("Genger Acted in Contempt of Court By Directing his Agent to Delete Company-Related Documents"); *Electr. Workers Pension Tr. Fund of Local Union 58, IBEW v. Gary's Electr. Serv.*, 340 F.3d 373, 382–385 (6th Cir. 2003) (holding that after movants meet their initial burden, "the burden of production shifts to [the defendant]" and remanding to the District Court to "make specific findings with respect to whether the parties satisfied their respective burdens.").

[100] *Wilson v. United States*, 221 U.S. 361, 385 (1911) (holding that corporate officer defendants in contempt actions related to the failure to produce corporate books and records "may demand that any accusation against them individually be established without the aid of their oral testimony or the compulsory production by them of their private papers."); *City of Wilmington v. Gen. Teamsters Loc. Union 326*, 321 A.2d 123, 127 (Del. 1974) ("[S]ome nexus must be established between the acts complained of [] and defendants in order to support a finding of contempt."); *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 833–34 (1994) ("Contempts involving out-of-court disobedience to complex injunctions often require elaborate and reliable factfinding."); *see also* 17 Am. Jur. 2d Contempt § 116 ("Generally, to support a finding of civil contempt for violation of a court order, the evidence must establish that . . . the alleged contemnor violated the order[.]").

[101] *Hurley*, 257 A.3d at 1017.

[102] *Id.* (citing *Fink v. State*, 817 A.2d 781, 788 (Del. 2003)).

sanctions."[103] They also claim that contempt cannot run against Shawe personally because he did not file the Nevada Action and the court did not find that he directed TPG to do so.[104] Pincus responds that the Final Order clearly barred the Nevada Action and that "Shawe controls TransPerfect and thus is responsible" for TPG's contemptuous conduct.[105] We affirm the Contempt Order and Sanction as they apply to TPG but hold that the Court of Chancery committed legal error when it sanctioned Shawe without sufficient findings of fact.

### i.   The Court of Chancery Did Not Err in Finding TPG in Contempt of the Final Order

Paragraph 10 of the Final Order provides that "the Court retains continuing and exclusive jurisdiction over the parties to the Actions for all matters relating to the Actions[.]"[106] The Court of Chancery found that TPG was in contempt of the Final Order because it was bound by the order, had notice of it, and meaningfully violated it by filing the Nevada Action.[107] TPG does not contest the notice prong.[108] It argues that the Final Order did not forbid the filing of the Nevada Action or even

---

[103] Opening Br. at 32.
[104] *Id.*
[105] *Id.* at 57.
[106] Final Order ¶ 10, A936.  The Court of Chancery issued this order on February 15, 2018.  *Id.* at 18, A936.  TPG does not contest that it filed the Nevada Action against Pincus on August 13, 2019, and that the Final Order was in effect on that date.  *See* Nev. Compl. at 1, A1119.
[107] Contempt Op., 2019 WL 5260362, at *13.
[108] *See id.* at *10; Opening Br. at 38 ("TPG did not act *pro se*.  At least half a dozen lawyers researched and advised on the issues, read the different orders, and determined that there was nothing inherently sanctionable about filing the Nevada Action.").

24

apply to TPG and that the Company had a good-faith basis to file the Nevada Action under the Director Indemnification Agreement (again, the "DIA"). We disagree and affirm the trial court's contempt finding against TPG.

The Final Order's reservation of "exclusive jurisdiction over the parties to the Actions for all matters relating to the Actions" clearly proscribed any lawsuit by TPG against Pincus in any forum except the Court of Chancery. This is because TPG was a party to both actions covered by the Final Order: *In re TransPerfect Global, Inc.* (C.A. No. 9700) and *Elting v. Shawe and TransPerfect Global, Inc.* (C.A. No. 10449).[109] These captions appear conspicuously at the top of the first page of the Final Order.[110] Moreover, there can be no serious doubt that TPG's suit against Pincus was "relat[ed] to the Actions." TPG's complaint challenged the validity of the Court of Chancery's 2019 Fee Orders, which awarded Pincus $65,203.85 in fees he requested under provisions in the Sale and Final Orders.[111] At the risk of stating the obvious, Pincus would not have petitioned for these fees had the court not named him Custodian, so they are clearly related to the actions in the Court of Chancery.

---

[109] Final Order at 1, A919. TPG's status as a nominal defendant in C.A. No. 10449 does not change the fact that it was a "party." *See Brookstone Partners Acquisition XVI, LLC v. Tanus*, 2012 WL 5868902, at *3 & n.34 (Del. Ch. Nov. 20, 2012) (explaining that "Woodcrafters is not a party to the Texas Action, but is a Nominal Defendant in the Delaware Action.").

[110] Final Order at 1, A919.

[111] Jun. 28, 2019 Order Approving Fees and Expenses, A1109; July 17, 2019 Order Approving Fees and Expenses, A1117; Contempt Op., 2019 WL 5260362, at *8 & n.60.

TPG also claims that it was not bound by the Final Order because "the Final Order expressly listed out the parties that were subject to its provisions, and TPG is not included."[112] For support, TPG cites Paragraph 3 of the Final Order, which identifies various parties who are required to release claims of liability and does not include TPG.[113] But Paragraph 3 relates to claim releases, not jurisdiction, and does not purport to override any other provision of the Final Order. Thus, it cannot be fairly read to negate the plain text of Paragraph 10, which, again, provides that "the Court retains continuing and exclusive jurisdiction over the parties to the Actions for all matters relating to the Actions."[114] TPG is a "part[y] to the Actions" and is bound by Paragraph 10.

TPG seeks refuge from the text of the Final Order by arguing that the Nevada Action actually sought relief from a different source, the DIA. The Company asserts that the Nevada Action attacked Pincus's right to request fees under the DIA, which included a non-exclusive jurisdiction provision.[115] This argument was doomed from the start because TPG's original Nevada Complaint did not even mention the DIA; it did, however, invoke the SPA and the Appointment, Sale, and Final Orders.[116]

---

[112] Opening Br. at 37 (emphasis removed).
[113] Final Order ¶ 3, A926–928.
[114] *Id.* ¶ 10, A936.
[115] DIA § 14N, A761–762 ("The Company and Indemnitee hereby (i) agree that any action or proceeding arising out of or in connection with this Agreement may be brought in the Delaware Court of Chancery[.]").
[116] *See* Nev. Compl., A1119. After Pincus moved for contempt sanctions, TPG amended its Nevada complaint to add a claim under the DIA. *See* Amd. Nev. Compl. ¶ 65, A1530. But the

26

Additionally, Pincus never requested fees under the DIA, which he would have had to do in writing to trigger its other provisions. Finally, any notion that the challenged fees were related to Pincus's service as a director is undercut by the record, which includes an email from TPG's general counsel stating that "Pincus has not been involved in the Cypress or [H.I.G.] litigation in his capacity as an officer or director of TransPerfect[.]"[117] In sum, the DIA did not provide a valid basis to file the Nevada Action because it had nothing to do with the 2019 Fee Orders TPG sought to challenge.

It is clear to us that TPG's violation was "meaningful" rather than "a mere technical one[.]"[118] TPG does not argue otherwise, and we agree with the trial court that that the Nevada Action put at issue not only the Final Order, but also various terms of other orders that the Nevada courts would have needed to interpret in order to adjudicate the case.[119] Thus, we conclude that the Court of Chancery did not err in determining that the Final Order bound TPG and that the Nevada Action meaningfully violated the exclusive jurisdiction provision in Paragraph 10. Because

---

amended complaint still challenges Pincus's right to seek reimbursement through the orders issued by the Court of Chancery in C.A. Nos. 9700 and 10449. Thus, even if we were to only consider the amended Nevada complaint, it, too, would plainly be "related to the Actions" in violation of Paragraph 10 of the Final Order. *See* Opening Br. at 43.

[117] Email from A. Mimeles to J. Voss, July 22, 2019, A1255. Indeed, the amounts in question were charged for time worked more than eleven months after Pincus resigned from the TPG board. *See* Contempt Op., 2019 WL 5260362, at *11.

[118] *Dickerson*, 1991 WL 208467, at *4.

[119] Contempt Op., 2019 WL 5260362, at *11.

27

TPG does not contest that it had notice of the Final Order when it filed the Nevada Action, we hold that the Court of Chancery did not abuse its discretion when it found TPG in contempt.

### ii. The Court of Chancery Erred When it Found Shawe in Contempt of the Final Order

Shawe was not a party to the Nevada Action.[120] Nevertheless, the Court of Chancery found him in contempt because "the filing of the Nevada Action violated paragraph 10 of the Final Order[.]"[121] On appeal, Shawe observes that TPG was the only plaintiff in the Nevada Action and that the Contempt Opinion lacks "any factual finding sufficient to impute liability onto Shawe for the actions of TPG."[122] Pincus responds that "Shawe controls TransPerfect and thus is responsible for TransPerfect's filing of the Nevada Action."[123] We hold that the Court of Chancery failed to make the specific, individualized findings of fact that were required to hold Shawe in civil contempt. Hence, we vacate the finding of contempt against him.

In the Contempt Opinion, the court explained why the Nevada Action was sanctionable, offering that "*TransPerfect* sued the Custodian in Nevada state

---

[120] The case was captioned *TransPerfect Global, Inc. v. Robert B. Pincus, Esq.*, and the complaint identified Shawe as a "relevant non-party." Nev. Compl. ¶ 7, A1121.

[121] Contempt Op., 2019 WL 5260362, at *10.

[122] Opening Br. at 32, 34; *see also* Reply Br. at 4 ("[T]he trial court never made any finding of fact to support a finding of contempt against Shawe for having ordered the filing of the Nevada action.").

[123] Answering Br. at 57.

court"[124] and "the filing of the Nevada Action violated paragraph 10 of the Final Order."[125] Throughout the Contempt Opinion, the court was careful to distinguish between Shawe's conduct and TPG's conduct, especially as it related to the filing of the Nevada Action. For example, the court stated that "*Shawe* advocated for entry of the Final Order before the Delaware Supreme Court in 2018, and *TransPerfect* specifically references the Final Order in the Nevada complaint."[126] The court never identified a specific action taken by Shawe personally that violated the Final Order, nor does Pincus point to one in his briefing. Nevertheless, the court found Shawe in contempt.

This was error. Although contempt is a discretionary power of the Court of Chancery, sanctions must still comply with the applicable legal standard. The standard for contempt of a court order is that a party "(1) is bound by an order, (2) has notice of the order, and (3) nevertheless violates the order."[127] Here, the trial court had the authority to sanction Shawe under Court of Chancery Rule 70(b), but to do so it was required to explain how he personally violated the Final Order. Issuing a contempt order without such a determination misapplied the law.

---

[124] Contempt Op., 2019 WL 5260362, at *8 (emphasis added).
[125] *Id.* at *10.
[126] *Id.* (emphasis added).
[127] *Trascent Mgmt. Consulting,* 2018 WL 6338996, at *1; *see Gallagher*, 2007 WL 3262150, at *2.

We are not announcing a new principle. In fact, the Court of Chancery embraced the same reasoning when it addressed a similar contempt motion brought against Shawe and TPG in December 2020 for other purported violations of court orders. The context for this motion was a legal malpractice lawsuit that TPG filed against Ross Aronstam Moritz, LLP in New York state court.[128] Ross Aronstam argued that the suit violated claim releases and antisuit covenants in the Sale Order and exclusive jurisdiction provisions in the Sale and Final Orders.[129] The court observed that TPG was the only named plaintiff in the New York case and that Shawe was not a party.[130] For this and other reasons, it declined to hold Shawe in contempt, explaining that

> [a]lthough it is indisputable that Shawe controls the Company through his 99% ownership of the Company, and although it is hard to imagine given the history of these proceedings that Shawe did not direct the Company to file the New York Action, there is no record before the court that he *actually* did so.[131]

For good measure, the court reiterated twice more that Shawe's involvement in the New York cases "implicates a question of fact for which there is no record."[132] This

---

[128] Intervenors' Mot. to Enforce the Orders of the Court and for Contempt ¶ 1, A3793.
[129] April 2021 Contempt Op., 2021 WL 1415474, at *5.
[130] *Id.*
[131] *Id.* at *6 (emphasis in original).
[132] *Id.* ("[D]emonstrating that Shawe caused the Company or acted in concert with the Company to initiate or pursue the claims in the New York Action would implicate a question of fact for which there is no record.").

analysis was sound: it correctly insisted upon record evidence that Shawe personally violated a court order as a predicate for a contempt finding.[133]

Pincus maintains that the preceding analysis is irrelevant because Shawe failed to raise this argument below and consequently is barred from raising it in this Court. This is a fair point. The thrust of Shawe's personal opposition to Pincus's contempt petition below was not that he had no hand in the filing of the Nevada Action but, rather, that the Nevada Action, as filed (and amended), did not violate the Final Order.[134] To put it differently, Shawe did not explicitly contest what at the time seemed apparent to all—that he had directed TPG to file the Nevada Action. Instead, he defended the allegations of contempt on the ground that the filing of the action did not run afoul of the Final Order. Implicit in this defense was that it didn't matter who filed—or directed the filing of—the Nevada Action.

On the other hand, Shawe was not entirely silent on the question of his personal responsibility for the Nevada Action. For instance, in his opposition below, he explicitly contended that "*Shawe* and TPG [were] not in violation of the circumscribed exclusive jurisdiction provision of the Final Order."[135] He likewise

---

[133] *See, e.g.*, *Wilson*, 221 U.S. at 385 (corporate officers facing a contempt motion "may demand that any accusation against them individually be established without the aid of their oral testimony or the compulsory production by them of their private papers."); *City of Wilmington*, 321 A.2d at 127 ("[S]ome nexus must be established between the acts complained of [] and defendants in order to support a finding of contempt."); *Bagwell*, 512 U.S. at 833–34 ("Contempts involving out-of-court disobedience to complex injunctions often require elaborate and reliable factfinding.").

[134] *See, e.g,* Shawe Opp'n ¶ 41, A1724–25.

[135] *Id.* ¶ 41, A1724 (emphasis added).

argued that Pincus "fail[ed] to meet his high burden to justify the extraordinary remedy of contempt . . . ,"[136] which arguably put Pincus on notice that he would be held to his burden of proving each element of civil contempt by a preponderance of the evidence. As discussed above, Pincus failed to do so, because the Court of Chancery ultimately did not find the specific, individualized facts required to hold Shawe in contempt.

For present purposes, we will assume—without deciding—that Shawe did not fairly present this argument in the Court of Chancery and thus deprived the Chancellor of the opportunity to evaluate it. Nevertheless, we have considered Shawe's argument on appeal because, under Rule 8, we may do so if we determine that "the trial court committed plain error requiring review in the interests of justice."[137] As we explained in *Shawe I*:[138]

> When reviewing for plain error, "the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[139] "Furthermore, the doctrine of plain error is limited to material defects which are apparent on the face of the record; which are basic, serious and fundamental in their character, and which clearly deprive an accused of a substantial right, or which clearly show manifest injustice."[140]

---

[136] *Id.*

[137] *Shawe I*, 157 A.3d at 168 (citing *Smith v. Del. State Univ.*, 47 A.3d 472, 479 (Del. 2012)).

[138] *Shawe I*, 157 A.3d at 168.

[139] *Smith*, 47 A.3d at 479 (quoting *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986)).

[140] *Wainwright*, 504 A.2d at 1100.

As discussed above, the Court of Chancery's contempt findings in this case contain a stark inconsistency: when fairly presented with the relevant arguments in response to Ross Aronstam's December 2020 contempt motion, the Chancellor concluded that he could not hold Shawe in contempt without evidence that Shawe personally filed or directed the New York lawsuit that violated the Court's orders.[141] This conclusion was based on the correct principle of law. Recognizing this, we cannot let the Contempt Order stand against Shawe because doing so would preserve an error that deprived him of the right to have each of the elements of contempt proved against him personally and found by the court. Given the seriousness of a civil contempt sanction, which may be accompanied by large fines and even imprisonment, this result would be "so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process" and would not, therefore, comport with the interests of justice.

We hold that to find a corporate officer or shareholder in civil contempt of a court order, the trial court must specifically determine that the officer or shareholder bore personal responsibility for the contemptuous conduct. This is consistent with requirement that, when an asserted violation of a court order is the basis for contempt, the party to be sanctioned must be bound by the order, have clear notice

---

[141] April 2021 Contempt Op., 2021 WL 1415474, at *6.

of it, and nevertheless violate it in a meaningful way.[142]  As a result, we vacate the Contempt Order and Sanction only as they apply to Shawe.

## B. The Court of Chancery Did Not Abuse Its Discretion by Discharging Pincus Via the Discharge Order

Shawe and TPG next assert that the Discharge Order was unsound because, when compared to the SPA, it "expand[ed] the scope of claims to be released" and classified TPG as a releasor.[143]  We disagree.  As discussed in further detail below, the Court of Chancery has discretionary authority to manage a custodianship. Hence, we review the Discharge Order for an abuse of discretion and find no abuse here.

### i.  The Terms of a Custodian's Discharge Are Subject to the Court of Chancery's Sound Discretion

The Court of Chancery's discretion to supervise receivers and custodians flows from 8 *Del. C.* § 226, which governs their appointment.  Section 226 provides:

> A custodian appointed under this section shall have all the powers and title of a receiver appointed under § 291 of this title, but the authority of the custodian is to continue the business of the corporation and not to liquidate its affairs and distribute its assets, except when the Court shall otherwise order[.]

---

[142] *Trascent Mgmt. Consulting*, 2018 WL 6338996, at *1; *see Gallagher*, 2007 Wl 3262150, at *2.
[143] Opening Br. at 4, 81–82; *see also* Answering Br. at 72–77; Discharge Op., 2021 WL 1401518, at *1 ("The discharge of a court-appointed custodian, as with the appointment of one, generally rests within the discretion of the appointing court.").

Section 226 refers to Section 291, which similarly imparts discretion to the trial court. It states that "[t]he powers of the receivers . . . shall continue so long *as the Court shall deem necessary*."[144] Thus, as we explained in *Giuricich v. Emtrol Corp.*, "under §§ 226 and 291, the Court of Chancery may determine the duration of the appointment and the specific powers to be conferred on the custodian."[145] Supported by this sturdy backdrop, in *Shawe I* we approved the appointment of Pincus as Custodian and explained that "the remedy to address the deadlock is ultimately within the Court of Chancery's discretion."[146]

Swimming against the current, Shawe and TPG maintain that the Court of Chancery enjoyed no discretion to establish the terms of Pincus's discharge because the terms were set in stone by the SPA.[147] This argument falls flat, for starters, because by approving the SPA, the trial court did not—and could not—relinquish its statutory authority to "determine the duration of the appointment and the specific

---

[144] 8 *Del. C.* § 291 (emphasis added).

[145] *Giuricich v. Emtrol Corp.*, 449 A.2d 232, 240 (Del. 1982). This discretion is consistent with the Court of Chancery's equitable authority to establish remedies. Thus, in *Jagodzinski v. Silicon Valley Innovation Co., LLC*, the Court of Chancery explained that "appointment and discharge of a receiver is ordinarily a matter resting within the sound discretion of the appointing court[.]" 2015 WL 4694095, at *6 (Del. Ch. Aug. 7, 2015) (quoting Ralph Ewing Clark, *A Treatise on the Law and Practice of Receivers* 1270 (3d ed. 1959)). We have also observed that the Court of Chancery enjoys "broad discretion . . . to fashion such relief as the facts of a given case may dictate[.]" *Weinberger v. UOP, Inc.*, 457 A.2d 701, 715 (Del. 1983). And we have stated that we "defer substantially to the discretion of the trial court in determining the proper remedy[.]" *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 439 (Del. 2000); *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 175 (Del. 2002) ("This Court reviews the Court of Chancery's fashioning of remedies for abuse of discretion.").

[146] *Shawe I*, 157 A.3d at 166.

[147] Opening Br. at 71–72.

powers to be conferred upon the custodian."[148]  Put differently, a contract—even if court-approved—cannot prospectively constrain a court's existing statutory powers.[149]  Helpfully, Section 12.18 of the SPA recognized this principle when it provided that, "[n]otwithstanding anything to the contrary set forth in this Agreement, the duties and responsibilities of all parties subject to the Sale Order and *all other orders of the Court . . .* shall remain in full force and effect *in accordance with their terms*."[150]  Applying this text is straightforward: the Discharge Order controls "[n]otwithstanding anything to the contrary set forth in this Agreement."[151]

In sum, the contract that Shawe and TPG seek to invoke expressly recognizes the primacy of court orders.  This is consistent with the Court of Chancery's discretionary authority to manage custodianships under 8 *Del. C.* § 226.  We will therefore review the Discharge Order for an abuse of discretion.

---

[148] *Giuricich*, 449 A.2d at 240.

[149] *See, e.g.*, *In re Appraisal of Metromedia Intern. Grp., Inc.*, 971 A.2d 893, 900 (Del. Ch. 2009) ("[A] valid contract will be enforced unless the contract violates public policy or positive law[.]"). In their Reply Brief, Shawe and TPG make a cursory, late breaking, and completely unsupported argument that the Discharge Order "materially decreas[es] the value of TransPerfect to the buyer after the transaction has closed [and] amounts to an unconstitutional taking."  Reply Br. at 33–34. Shawe and TPG did not articulate this argument in their Opening Brief.  It is therefore waived. Sup. Ct. R. 14(b)(vi)(A)(3) ("The merits of any argument that is not raised in the body of the opening brief shall be deemed waived and will not be considered by the Court on appeal.").

[150] SPA § 12.18, A848 (emphasis added).

[151] *Id*.

### ii. The Court of Chancery Did Not Abuse Its Discretion in Establishing the Terms of Pincus's Discharge

The Court of Chancery did not abuse its discretion when it established the terms of Pincus's discharge through the Discharge Order. An abuse of discretion occurs "when the trial judge exceeds the bounds of reason in view of the circumstances and has so ignored recognized rules of law or practice so as to produce injustice."[152] We have also identified a reversible abuse of discretion "when a relevant factor that should have been given significant weight is not considered[.]"[153] Beyond their attempt to recast this issue as a question of contract law, Shawe and TPG do not identify a specific abuse of discretion by the trial court.[154] Nor do we see any. As such, we affirm the Discharge Order.

The Court of Chancery issued the Discharge Order after reviewing proposals from all parties and hearing oral argument. Shawe and TPG proposed a single paragraph stating that Pincus was discharged "and shall retain the same protections and indemnification rights granted to him under the Securities Purchase Agreement, the Sale Order and the Final Order in his individual capacity as he has had in his capacity as Custodian."[155] Pincus's proposal was 17 paragraphs and contained

---

[152] *Wright*, 131 A.3d at 320.
[153] *Homestore I*, 886 A.2d at 506.
[154] *See* Reply Br. at 30–31 ("Indeed, the abuse of discretion standard, as outlined by Pincus, does not apply, as Appellants are not challenging Pincus' discharge, but rather are challenging the modification of the SPA contained in the discharge order.").
[155] Shawe's and TPG's Proposed Order of Discharge at 1, A3901.

37

numerous purported illustrations of his protections "[f]or the avoidance of doubt[.]"[156] One of Pincus's requests was that TPG be required to release all potential claims of liability against Pincus.[157]

The trial court concluded that the single paragraph offered by Shawe and TPG was "inadequate for the task" and that Pincus's proposal was "worded in a manner that could be construed as expanding upon pre-existing protections[.]"[158] The court deleted many of Pincus's proposed clarifications, but it clarified that TPG was required to release any claims against Pincus related to his work as Custodian.[159] The court explained that this clarification was consistent with the SPA and that the additional detail was required "[g]iven the lengthy and fractious history of these actions [and] the numerous (and often frivolous) collateral litigations spawned from the sale process that have embroiled the Custodian and many others[.]"[160]

In our view, it was sensible for the trial court to clarify the scope of Pincus's protections. This appeal is just one example of the litigation risk Pincus has been compelled to navigate during his time as Custodian. Because Shawe and TPG have not identified even a purported abuse of discretion on appeal—and reiterated in their Reply Brief that they are not attempting to do so—we affirm the Discharge Order.

---

[156] Custodian's Proposed Order of Discharge ¶¶ 6–15, A3755–63.
[157] Id. ¶ 15, A3763.
[158] Discharge Op., 2021 WL 1401518, at *1–2.
[159] Id. at *3, A5181; Discharge Order ¶ 9, Ex. C to Opening Br. at 15–16.
[160] Discharge Op., 2021 WL 1401518, at *1.

## C. The Court of Chancery Did Not Abuse Its Discretion or Otherwise Err by Awarding Pincus $3.2 Million in Fees and Expenses

Finally, Shawe and TPG argue that the Court of Chancery committed various errors in the 2021 Fee Order, which awarded Pincus $3,242,251 in fees and expenses he incurred from May 2019 to December 2020.[161] Shawe and TPG divide their objections into three groups. *First*, they challenge the $365,127 that the trial court awarded Pincus for his efforts to enforce the 2019 Fee Orders, which TPG refused to comply with.[162] *Second*, they assert that $594,793 in fees awarded to Pincus were not recoverable absent a showing of bad faith, which Pincus never made.[163] *Third*, they bring eight distinct objections to the reasonableness of the entirety of the $3,242,251 award, including that the trial court failed to properly apply its own orders.[164]

When an award of attorneys' fees is grounded in a contract or court order, we review the authorizing provisions *de novo*.[165] If an award is legally permissible, however, the determination of the appropriate amount is a classic matter for the trial

---

[161] 2021 Fee Order ¶ 2, Ex. D to Opening Br.; Fee Op., 2021 WL 1711797, at *48.
[162] Opening Br. at 53–58.
[163] *Id.* at 53–54, 58–61.
[164] *Id.* at 53–54, 61–70.
[165] *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 675 (Del. 2013) ("While we review an award of attorneys' fees for abuse of discretion, we review the Vice Chancellor's interpretation of a contractual fee-shifting provision *de novo*.") (internal citations omitted); *Town of Cheswold v. Central. Del. Bus. Park*, 188 A.3d 810, 813, 818 (Del. 2018) (interpreting stipulated court orders "like contracts."); *accord Harley–Davidson, Inc. v. Morris*, 19 F.3d 142, 148 (3d Cir. 1994); *see also* Am. Jur. Mots. § 48 ("[W]here necessary, the proper interpretation of a court order is a matter of law.").

court's discretion.[166]  We conduct a highly deferential abuse-of-discretion review by keeping in mind the non-exhaustive factors of Rule 1.5(a) of the Delaware Lawyers' Rules of Professional Conduct.[167]  To prevail on their challenges, Shawe and TPG "must establish either that the Chancellor failed to assess the reasonableness of the fees and expenses or that his determination that the fees and expenses were reasonable was capricious or arbitrary."[168]  It is clear that the Court of Chancery carefully considered Pincus's requests and the related objections and painstakingly assessed the reasonableness of the fees and expenses at issue.  In our view, the Court's award was reasonable and not an abuse of discretion.  We therefore affirm the 2021 Fee Order.

### i. The Court of Chancery Did Not Abuse Its Discretion by Awarding Pincus $365,127 Related to the 2019 Fee Orders

Shawe's and TPG's first target is the $365,127 that the trial court awarded to Pincus for fees incurred during his efforts to enforce the 2019 Fee Orders.[169]  As discussed above, after TPG failed to pay these bills—which totaled $65,203.85—

---

[166] *Scion Breckenridge*, 68 A.3d at 675.

[167] *Mahani v. Edix Media Grp., Inc.*, 935 A.2d 242, 245–246 (Del. 2007).  These factors are "(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent."  *Id.* at 246.

[168] *Id.*

[169] Opening Br. at 54; Fee Op., 2021 WL 1711797, at *40 & n.386.

Pincus filed a motion for civil contempt and sanctions to recover them, as well as the costs of litigating the issue.[170] The court declined to make a contempt finding as to the unpaid fees but explained that Pincus retained the right to seek reimbursement under the court's previous orders.[171] Accordingly, in his December 15, 2020 Fee Petition, Pincus requested $425,127 "in connection with disputes over the [2019] Fee Orders, prior fee petitions, and billing records."[172] Of this amount, the trial court awarded Pincus $365,127.[173] We affirm this award.

Shawe and TPG assert that the court "abused its discretion by finding that despite successfully defending against Pincus's Contempt Motion, TPG was nevertheless responsible for those fees."[174] This argument treats the court's denial of Pincus's contempt motion as to the unpaid fees and costs as the final word on whether those amounts could be awarded at all.[175] The Court of Chancery was prescient on this point: the order denying the motion explained that, but for changes not at issue here, it "[did] not modify, invalidate or otherwise alter any provision of

---

[170] Custodian's Mot. for Contempt ¶ 79, A1351.
[171] Fee Process Order at 2, Ex. B to Opening Br.
[172] Custodian's Dec. 15, 2020 Fee Petition at 11, A3779.
[173] 2021 Fee Op., 2021 WL 1711797, at *40 & n.386. The court overruled the various objections brought by Shawe and TPG against these fees but subtracted $60,000 for work relating to drafting and implementing confidentiality restrictions, which the court found not to be recoverable. *Id.* Pincus does not cross-appeal this or any other reduction.
[174] Opening Br. at 54.
[175] *Id.* at 55.

the Sale Order [], the Final Order, the First Order, or any other orders[.]"[176] Thus, the court explicitly preserved Pincus's right to seek reimbursement under these orders.[177]

Shawe and TPG also argue that Pincus should not have been reimbursed for the approximately $25,000 he billed to allocate his unpaid fees between the Final Order and the 2019 Fee Orders.[178] We agree with the trial court that this split was required because the Contempt Sanction made Shawe personally liable for fees related to the Final Order, while the 2019 Fee Orders only bound TPG.[179] Thus, an allocation was required in part to determine the extent of Shawe's personal liability. Indeed, this is particularly salient on appeal given our conclusion that the trial court erred by extending the Contempt Sanction to Shawe.

We conclude that the Court of Chancery did not abuse its discretion when it awarded Pincus $365,127 in fees and expenses related to his efforts to enforce the 2019 Fee Orders.

---

[176] Fee Process Order ¶ 2, Ex. B to Opening Br. The Fee Process Order required Pincus to furnish additional billing information—at Shawe's and TPG's request—and clarified the Contempt Sanction related only to fees incurred by Pincus in connection with "TPG's and Shawe's contempt of the Final Order." *Id.* ¶¶ 3(a), 7.

[177] For example, and as discussed above, Paragraph 14 of the Sale Order provides in pertinent part that "[t]he Custodian shall be compensated at the usual hourly rate he charges [and] reimbursed for reasonable travel and other expenses incurred in the performance of his duties." Sale Order ¶ 14, A770. Under Paragraph 14, "[a]ny fees and expenses approved by the Court shall be paid promptly by the Company." *Id.*; *see* Contempt Op., 2019 WL 5260362, at *3 & n.36.

[178] Opening Br. at 55–56.

[179] *See, e.g.*, Jun. 28, 2019 Order Approving Fees and Expenses at 1, A1109 ("[T]he petition is approved and TransPerfect Global, Inc. shall make prompt payment[.]").

### ii. The Court of Chancery Did Not Err in Awarding Pincus $594,793 in Fees Related to the Omnibus Objection

Shawe and TPG next attack the Court of Chancery's award of $594,793 to Pincus for the fees and expenses he incurred in responding to their 202-page objection to his fee petitions from May to October 2019 (the "Omnibus Objection").[180] According to Shawe and TPG, the trial court's November 2019 Fee Process Order provides that such fees are only recoverable if the petitioning party shows that the objections were made in bad faith.[181] Because Pincus did not allege bad faith, the argument goes, none of these fees were validly awarded.[182] This challenge requires us to interpret a court order, so our review is *de novo*.[183] The Court of Chancery rejected the argument that the Fee Process Order required Pincus to prove bad faith to recover these fees.[184] We agree and affirm the award.

Shawe and TPG urge us to apply Paragraph 3(e) of the Fee Process Order, which provides:[185]

> To the extent that any party is found to have acted in bad faith regarding the fee petition and objection process set forth in Paragraph 3(c) herein, the Court may order that such party pay fees and expenses incurred by the other

---

[180] Fee Op. at Ex. A, Ex. D to Opening Br.; Omnibus Objection, A2862–3064. Pincus initially sought $605,793 for his response to the Omnibus Objection. Fee Op., 2021 WL 1711797, at *43. The court excluded from this request $11,000—most of which Pincus withdrew voluntarily—relating to the preparation of billing statements. *Id.*

[181] Opening Br. at 58.

[182] *Id.* at 61.

[183] *Scion Breckenridge*, 68 A.3d at 675.

[184] Fee Op., 2021 WL 1711797, at *44–45.

[185] Fee Process Order ¶ 3(e), Ex. B to Opening Br. at 4 (emphasis added).

party or parties in connection with the objection process at issue.  <u>For the avoidance of doubt, any such order shall be in addition to, and without prejudice to, the Custodian's right to recover such amounts pursuant to the Court's orders or any other agreement or entitlement.  Nothing in this paragraph shall be construed to allow the Custodian a double recovery of fees and expenses, unless the Court otherwise orders.</u>

The underlined language—unhelpfully omitted by Shawe and TPG in their briefing—clearly provides that that the court's authority to order bad-faith fee-shifting "shall be in addition to, and without prejudice to, the Custodian's right to recover such amounts pursuant to the Court's orders or any other agreement or entitlement."[186]  Even if read in isolation, the first sentence of Paragraph 3(e) says nothing about precluding Pincus's other methods of reimbursement, such as under the Appointment, Sale, and Final Orders.

For these reasons, it is clear to us that Paragraph 3(e) did not eliminate Pincus's right to petition for fees under, for example, Paragraph 14 of the Sale Order.  Thus, we affirm the award of $594,793 to Pincus for the fees and expenses he incurred in responding to Shawe's and TPG's objections.

---

[186] *Id.*; Opening Br. at 59.  Shawe and TPG also allege that the Escrow was the "Default Payor" and that, as a result, and charges directly to TPG must be accompanied by a showing of bad faith.  This position relies on the incorrect reading of Paragraph 3(e) discussed above and on a classification of the Escrow as the "default" source of funds that does not appear to be grounded in any order or ruling of the court.  Opening Br. at 59.

### iii. The Court of Chancery's Award Was Reasonable

In addition to the piecemeal objections discussed above, Shawe and TPG challenge the reasonableness of the entire $3,242,251 award on eight distinct grounds. As an initial matter, we note that the Court of Chancery's analysis of the disputed fees was exhaustive. In his 135-page Fee Opinion, the Chancellor considered objections from Shawe and TPG that numbered in the dozens. These challenges attacked "virtually every time entry in the fee petitions" and incorporated a seventeen-part "Tagging Guide" of purportedly "Generally Objectionable Billing Practices."[187] Although the court generally found that Pincus's billing was reasonable, it sustained some of Shawe's and TPG's objections and rejected or reduced Pincus's requests in at least six areas.[188] The final award was for 84 percent of the amount Pincus initially sought.[189]

For simplicity, we address Shawe's and TPG's arguments in three buckets: (1) challenges to Skadden's hourly rates, (2) allegations that Skadden billed improperly, and (3) claims that Skadden's fees in certain areas should have been paid by the Escrow, which was funded evenly by Shawe and Elting. As above,

---

[187] Fee Op., 2021 WL 1711797, at *18, 31; *see* Ex. B to Omnibus Objection at Ex. 4, A3024.

[188] Fee Op., 2021 WL 1711797, at *32 (reducing fees for clerical and administrative work); *id.* at *41 (excluding fees for defending confidentiality motions); *id.* at *43 (excluding fees for the preparation of billing statements); *id.* at *45 (excluding fees for the preparation of monthly update letters); *id.* at *46 (partially excluding fees for preparation of a proposed discharge order); *id.* at *47 (excluding fees for preparation of a settlement offer and reducing fees for a large Westlaw charge).

[189] *See* Ex A. to Fee Op., Ex. D to Opening Br.

although we review an award of attorneys' fees for abuse of discretion, we consider the court's interpretation of relevant orders and contractual provisions *de novo*.[190] Also, we do not disturb the trial court's factual determinations unless they are clearly erroneous.[191] Applying these standards, we conclude that Shawe and TPG have failed to show that the trial court did not assess the reasonableness of the fees it awarded to Pincus or that it acted arbitrarily in doing so.[192]

### a. Skadden's hourly rates were reasonable

When the Court of Chancery installed Pincus as Custodian, it provided in Paragraph 11 of the Appointment Order that "[t]he fees of any counsel or advisors . . . shall be calculated on the same hourly rates charged by such counsel or advisors to clients represented outside this matter."[193] In the Fee Opinion, the court found as a matter of fact that "Skadden's rates . . . complied with this court's orders."[194] Shawe and TPG claim that this was error because Skadden only certified that its rates were "consistent" with those charged to other clients, not "the same."[195] Shawe and TPG additionally argue that Skadden's rates were "outrageous" and that a

---

[190] *Scion Breckenridge*, 68 A.3d at 675.
[191] *Bäcker*, 246 A.3d at 95.
[192] *Mahani*, 935 A.2d at 245.
[193] Appointment Order ¶ 11, A751.
[194] Fee Op., 2021 WL 1711797, at *24.
[195] Opening Br. at 62–64.

46

"reasonable client" discount should have been applied.[196] We reject each of these arguments about Skadden's hourly rates.

We review the trial court's determination that Skadden's hourly rates were "the same" as those it charged other clients for clear error.[197] The court considered three sources of evidence. The first was an affidavit sworn by Skadden partner Jennifer Voss stating that the firm's rates "are consistent with the hourly rates charged by Skadden (including by the Delaware office of Skadden) to clients represented outside this matter."[198] The second was a series of filings in which "federal courts approved applications in 2019 to compensate Skadden at rates in line with the rates [charged in this case]."[199] The third consisted of filings "for twelve other firms whose hourly rates were in line with the rates Skadden charged here."[200] These data, especially when considered alongside Voss's affidavit, support the determination that Skadden complied with the court's orders regarding hourly rates. Even if it were possible to view this evidence differently, "[w]hen there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."[201] We therefore affirm the trial court's finding that Skadden's rates satisfied Paragraph 11 of the Appointment Order.

---

[196] *Id.* at 69.
[197] *Bäcker*, 246 A.3d at 95.
[198] Voss Aff. ¶ 6, A5066.
[199] Fee Op., 2021 WL 1711797, at *24.
[200] *Id.*
[201] *Bäcker*, 246 A.3d at 95.

47

We turn next to the claim that "Skadden's attorneys billed at outrageous rates[.]"[202] In determining the appropriate amount of fees to award, the trial court found that Skadden's rates were reasonable.[203] We review this for an abuse of discretion.[204] As an initial matter, the evidence discussed above regarding the rates charged by comparable firms in other cases runs contrary to the claim that Skadden's rates in this matter were "outrageous." Moreover, although Shawe and TPG retained an expert to challenge Skadden's fees, the trial court observed that the expert focused primarily on only one of the eight non-exhaustive factors articulated by Rule 1.5(a), "the fee customarily charged in the locality for similar legal services[.]"[205] Consistent with our guidance, the court considered other Rule 1.5(a) factors, including "the amount involved and the results obtained" and "the novelty and difficulty of the questions involved[.]"[206] The court concluded that Pincus and Skadden faced a complex task and navigated significant obstacles, further justifying the hourly rates charged.[207] In our view, the court's reasonableness determination was adequately supported.

---

[202] Opening Br. at 67.
[203] Fee Op., 2021 WL 1711797, at *27.
[204] *Mahani*, 935 A.2d at 245–246.
[205] Fee Op., 2021 WL 1711797, at *27.
[206] *Id.*
[207] *Id.*

Shawe and TPG also assert that Skadden should have discounted its rates.[208] As above, this claim is undercut by the trial court's finding that Skadden's rates were similar to what it and peer firms charged in other matters. In any case, Shawe and TPG cite no controlling authority that requires a "reasonable client" discount. In fact, in *In re RegO*, Chancellor Allen awarded fees to a court-appointed guardian *ad litem* and explained that the "position that work of this sort is a quasi-public service that deserves to be paid at a discount is without authority."[209] We agree and conclude that none of Shawe's and TPG's challenges to Skadden's hourly rates has merit.

### b. Skadden did not bill improperly

Next, Shawe and TPG allege that Skadden billed improperly by producing vague entries and charging in full for overstaffed matters and simple research tasks. The trial court considered and rejected these challenges in calculating the overall fee award.[210] Thus, once again, we review for an abuse of discretion.[211] We reject these objections.

Shawe and TPG first contend that "many of the billing entries were far too vague to categorize the work performed in any meaningful or accurate way."[212] Yet, Shawe and TPG provide no examples of this in their appellate briefing. In the Fee

---

[208] Opening Br. at 69.
[209] *In re RegO*, 19 Del. J. Corp. L. 858, 1993 WL 488240, at *3 (Del. Ch. 1993).
[210] Fee Op., 2021 WL 1711797, at *31–36.
[211] *Mahani*, 935 A.2d at 245–246.
[212] Opening Br. at 68.

Opinion, the Court of Chancery rejected this claim.[213] Among other things, the court noted that Shawe's and TPG's "Tagging Guide" appeared to be over-inclusive, as it tagged as "vague" an entry for 12 minutes of billed time with this description: "confer with B. Pincus re: Cypress subpoena and follow up re: subpoena."[214] Our review of the record reveals other questionable challenges.[215] For these reasons, we reject the objection.

Next, Shawe and TPG assert that Skadden billed in full for matters that were overstaffed. They provide two examples. In the first, Skadden sent five timekeepers to a hearing that was attended by at least four attorneys for Shawe and TPG, as well as at least one attorney representing Shirley Shawe.[216] In the second, 12 timekeepers billed for the response to Shawe's and TPG's 202-page Omnibus Objection.[217] The complaint by Shawe and TPG that Pincus billed approximately $600,000 to defend about $240,000 in contested fees may have some intuitive appeal, but it is a concrete cold fact that a 202-page onslaught of objections is going to force a detailed and

---

[213] Fee Op., 2021 WL 1711797, at *32 & n.313.

[214] *Id.*

[215] *See* Ex. H to Omnibus Objection at 14, A2966 (classifying as "vague" an entry for 3 hours with the following description: "Attention to Cypress subpoena to Pincus; attention to court's order [] re: confidentiality and parties' brief re: same; draft notes for response (including defenses); review Cypress engagement letter; confer with Cypress counsel re: meet and confer; attention to CPLR and services/jurisdiction issues.").

[216] Opening Br. at 68; *see* Oct. 21, 2019 Ch. Ct. Tr. at 2–3, A2501–2502. As the trial court observed, this hearing—during which the court delivered an oral ruling on Pincus's 2019 motion for contempt—"was not a minor matter." Fee Op., 2021 WL 1711797, at *33.

[217] Opening Br. at 68; *see* Omnibus Objection, A2862–3064.

exhaustive response. To restate an observation that has unique applicability to the current dispute, "it is more time-consuming to clean up the pizza thrown at a wall than it is to throw it."[218]

Third, Shawe and TPG complain that "Skadden billed hundreds of hours and hundreds of thousands of dollars for 'research,' despite the issues at hand being relatively straightforward."[219] The Court of Chancery fully considered and rejected this claim, and Shawe and TPG do not develop specific examples of the purported impropriety in their appellate briefing.[220] Our own review of the record confirms that the Court of Chancery correctly dismissed this objection.[221] For example, in the Omnibus Objection, Shawe and TPG attacked Skadden "for researching 'indemnity rights'" for seven hours.[222] Of course, Pincus's right to indemnification was a hotly contested issue in this case, so the suggestion that Skadden's research into the matter constituted an overreach pays scant heed to reality. We conclude that Shawe's and TPG's challenges to Skadden's billing practices lack merit.

### c. Skadden did not improperly charge TPG instead of the Escrow

Shawe and TPG argue that Pincus and Skadden should have exclusively used the Escrow—which was funded evenly by Shawe and Elting—to cover fees, instead

---

[218] Fee Op., 2021 WL 1711797, at *1 (quoting *Auriga Cap. Corp. v. Gatz Props., LLC*, 40 A.3d 839, 882 n.184 (Del. Ch. 2012) (Strine, C.)).
[219] Opening Br. at 70.
[220] Fee Op., 2021 WL 1711797, at *34.
[221] *Id.*
[222] Omnibus Objection at 35–36 & n.16, A2898–2899.

of charging TPG directly.[223]  Shawe and TPG make the same argument specifically as to the fees related to the Cypress and H.I.G. Actions.[224]  This question concerns the court's authority to grant Pincus direct reimbursement from TPG, so our review is *de novo*.[225]  As discussed at length, provisions in the Appointment, Sale, and Final Orders authorize Pincus to charge TPG directly for his fees, rather than the Escrow. For example, Paragraph 14 of the Sale Order, which we affirmed, provides that "[t]he Custodian shall be compensated at the usual hourly rate he charges [and] reimbursed for reasonable travel and other expenses incurred in the performance of his duties" and that "[a]ny fees and expenses approved by the Court shall be paid promptly by the Company."[226]  Although Pincus was also authorized to charge the Escrow directly under Section 2.2 of the SPA, this was a "non-exclusive source of funds" and Pincus adequately and repeatedly explained his reasons for charging TPG for certain post-sale fees that had little to do with Elting's conduct.  The Court of Chancery did not abuse its discretion in allowing him to do so.

---

[223] Opening Br. at 69.
[224] *Id.*
[225] *Scion Breckenridge*, 68 A.3d at 675.
[226] Sale Order ¶ 14, A770.

## III. CONCLUSION

For the reasons stated above, we reverse and vacate the Court of Chancery's October 17, 2019 Contempt Order and Sanction only as they apply to Philip R. Shawe. We affirm the Contempt Order and Sanction as they apply to TransPerfect Global, Inc. Additionally, we affirm the court's April 14, 2021 Discharge Order terminating the custodianship of Robert B. Pincus. Finally, we affirm the April 30, 2021 Fee Order awarding Pincus $3,242,251 in fees, subject to the qualification that TransPerfect Global, Inc. is the only party liable for the $1,148,291 Contempt Sanction.